Good morning, Your Honor. If it may please the Court and Counsel, my name is Bruce Randke and I represent the appellate Rolex Corporation. On December 1, 2010, Mr. Guglielmini was working at a paint line stamping materials. He slipped on some oil and as a result of that fall began experiencing pain in his left ankle. He treated with Dr. Castillo, who diagnosed Mr. Guglielmini with a left ankle sprain. Rolex properly compensated Mr. Guglielmini for the period of time in left ankle injury and paid for his medical and physical therapy expenses associated with the treatment of his left ankle. While Mr. Guglielmini may have sustained a work-related injury to his ankle, the Commission erred in affirming the arbitrator's ruling that Mr. Guglielmini sustained a knee injury and requires arthroscopic surgery as a result of the work-related injury. I'm going to pass over the standard review because I'm sure Your Honors are very much familiar with the standard review with regard to this case and really focus on the medical evidence itself. And that medical evidence demonstrates that Mr. Guglielmini did not sustain a compensable knee injury. What about Dr. Silver? He opined that the need for the surgery was causally connected to the work accident in December 1st, 2010, and that without the procedure, quote-unquote, claimant was risking permanent disability. That sounds like some evidence in favor of the claimant, doesn't it? Absolutely, Your Honor. And we do not dispute that Dr. Silver reached that conclusion. The question is whether or not that Dr. Silver's conclusion was contradicted by the objective medical evidence in this case, including the MRI that he himself ordered, which demonstrated that there was no evidence of any cartilage damage to Mr. Guglielmini's knee and ruled that he did not require any additional surgery. Let's talk about that for a second. Silver acknowledged that the MRI, the first one, looked like the knee was essentially normal. He then also requested an MRI with a stronger magnet, which he thought would better assess the damage, and the procedure was never approved. However, Silver's objective findings, his examination, his opinion confirmed that he had an injury. So let me ask you about Dr. Levin, because I'm sure you're going to tell us that he's contrary. Did Levin also opine, however, that he thought that there was a problem with the leg himself? Where am I getting that at? Yes, Your Honor, he did. Dr. Levin noted that there was some atrophy given the fact that his leg was immobilized for a while that could have exacerbated a pre-existing injury. Right, it could have resulted in an aggravation of the underlying pre-existing condition, which would support recovery as well, wouldn't it? Well, no. The question is whether or not there was cartilage damage as a result of the work-related injury, which would require arthroscopic surgery. The result of Dr. Levin's conclusion is essentially that Mr. Igustini would need to go through some additional physical therapy to strengthen the muscles in his quadriceps, and then he could be returned to full duty. Let me ask you this, though. Sometimes take a step back. You've got conflicting medical opinions you'd have to concede, okay? And rather than going down that road, you know, indefinitely, did he have any complaints about his knee problems prior to the December 1, 2010? There's no record of that, was there? There certainly is no record, Your Honor. Doesn't that weigh in the claimant's favor? Well, it certainly supports the claimant's theory, but if you also look at the timeline here, he has his knee injury on the 1st, and then it's not until another 10 weeks in which he's treating with Dr. Ramirez, and it's 10 weeks to go by before he first complains about any knee complaints. Because primarily he's complaining about his ankle, right? Yes. It wasn't like he went in and didn't know what he was being treated for. There was, you know, he had the ankle issue first, then he had the knee as well. True. But certainly there's nothing to prevent him if he was having issues with his knee when he was treating with Ramirez to advise a doctor that he was having issues with his knee. And it's only 10 weeks after he's treating with Dr. Ramirez that Dr. Ramirez knows that he is having problems with his knee. And it's an additional three months after the incident that he starts treating with Dr. Silver. All of which, with regard to the cartilage damage, is directly contrary to the one MRI that was taken of Mr. Ugacini's knee, which was negative. It's also contrary to the x-rays. But Silver explained that, didn't he? He says that the MRI was a rather weak magnet and relatively insensitive to articular cartilage. So he explained why it didn't show. Yes, Your Honor. I posit that's somewhat convenient, right? I mean, Dr. Silver was the one that ordered that MRI to be taken. If he did think that given, well, let me take a step back. He knew he was sending him for an MRI to possibly diagnose cartilage. If he was concerned about the strength or the sensitivity of that MRI, he should have specifically asked for the T3. He didn't. He gets the MRI results back. Unfortunately for him, they were inconsistent with his conclusion, so he simply ignores them. I think rather than speculating as to what the MRI that wasn't taken, let's look at what's the MRI that was taken, and that certainly was negative. Well, he explains it away, but then he orders the 3T MRI, and it was never approved. Correct. So it wasn't taken. No, it was not. So it wasn't that Silver was trying to dodge it. He actually wanted the 3T MRI. It's just your client wouldn't approve it. Well, he should have ordered it in the first place. Well, I mean, what he should have done in the first place, he should have done in the first place. He's got an explanation as to why the first MRI didn't show anything. He orders the MRI that's supposed to be the test that's going to show whether there is articular cartilage damage, and you don't approve it. So you fault him now because he didn't order the 3T first? Well, I mean, certainly that was his option. If he was very concerned about having that specific MRI taken, he should have ordered it in the very first place rather than spending additional monies to come up with the same conclusion. So you're saying absence of evidence is evidence of absence? It seems to be what you're saying. Not necessarily. But you set up the scenario. I understand your question, Your Honor. But the point is, is that, you know, Dr. Silver cannot simply say, well, the other MRI would have shown X as evidence that it would have shown X, but it was never taken. Right. But trying to disprove the negative, I don't know how that helps you. Okay? I mean, you've got two experts. You've got, as you've also got the acknowledgment that the claimant was asymptomatic with his left knee until the date of the accident. True. Why can't the commission give that pretty significant weight? Well, I think part of it is, number one, the issue of timing, right? When the time in which the injury occurred, in which he first started complaining to Dr. Ramirez, there's a significant amount of time. Well, Ramirez, the doctors explained that. They said because they were focusing in on the ankle, because that was the greater problem initially. Well, it certainly didn't preclude them from indicating that he was also experiencing knee pain. When he did, I think it's important that when he did complain of knee pain, ten weeks later, Ramirez referred him to Dr. Silver to look at the knee. Had that occurred before then, arguably he would have went and referred him to Dr. Silver. So your theory is nothing happened to his knee? I'm trying to grasp your theory. No, what I'm suggesting is something may have happened, but it certainly was not related to the work injury back in December. Okay, but there's no evidence of anything else, is there? No, there is not, Your Honor. And we're left to speculate as to how this could have occurred, right? Klayman said it happened in the accident. Pardon? Klayman said it happened, and the commission apparently believes it. True. And Dr. Levin looked at the Klayman's knee, examined him, looked at the MRI, which was negative, looked at Dr. Silver's notes, and he concluded that there was no cartilage damage as a result of the work-related injury and did not require arthroscopic surgery. And so does the commission have to believe Levin over Silver? No, and admittedly, right, you may have somewhat conflicting medical evidence, right, but going back to the Osco case and the Sears case that we saw in our briefing, Dr. Silver's opinions are not supported by the objective medical evidence, certainly not supported by the MRI that was taken. Going back to kind of the chronology of the evidence, because I think it's important to kind of go through that, on the day of the accident, he treated with Dr. Castillo. Dr. Castillo examined him, ordered x-rays of both the ankle and the knee. Both were negative. He also diagnosed Ugostini with a sprained ankle. He referred him to an orthopedic, Dr. Fillett, for follow-up treatment and discharged Ugostini from his care. Ugostini did not see Dr. Fillett, but rather treated Dr. Ramirez for his sprained ankle, beginning on December 2, 2010. Ugostini underwent an MRI for a sprained ankle, which revealed no fractures of the ankles. And again, in February of 2011, more than 10 weeks after the injury, the first time that Dr. Ramirez noted that Ugostini had complained about injury to his left knee. And at that time, upon those complaints, he referred him to Dr. Silver. And again, three months after the incident, Ugostini goes to see Dr. Silver. Dr. Silver ordered the MRI. MRI showed no cartilage damage. And then, in fact, in August of 2011, Dr. Silver acknowledges that the MRI was negative and returned him back to work. It was only 13 months after the accident that Dr. Silver prescribed arthroscopic surgery for Ugostini. And then in March of 2015, more than 15 months after the injury, Dr. Silver was still prescribing significant pain medications for Ugostini. Let me ask you this. You talked about you're hinging your argument on a delay between the injury, the alleged injury, and the treatment of the knee. That's right. Doesn't the arbitrator himself address that? He gives more weight to the testimony of Dr. Silver and finds the accident caused damage to the cartilage in the left knee. Also, quote-unquote, the lengthy period of immobilization of the left lower extremity to treat the ankle injury contributed to the issues with the claimant's knee. So you have to take the employee as you find them. Yes, Your Honor. But that does not necessarily mean that Mr. Ugostini had sustained cartilage damage resulting in the need to have arthroscopic surgery. Except for the testimony and the opinion of Silver. That's correct. I know you'd like to forget about Silver on your side of the case, but he's there. I understand he's there. And he's not on your side, by the way. I'm going to give you a subtle hint. Pardon? He's not on your side, by the way. I certainly acknowledge that as well. I mean, there's multiple ways to look at this. But the point with Dr. Silver is, again, it's contrary to his own MRI that was ordered, and it's also contrary to Dr. Love and Dr. Lee and Dr. Abram and Dr. Grossman. When Dr. Lee conducted an MRI of Ugostini, he noted that there was no objective findings to explain Ugostini's claimed level of disability or complaints. Dr. Lee concluded that Ugostini had symptom magnification, if not outright, malingering. Let's talk about that for a second. Sure. And you can make that inference. Dr. Lee's opinion primarily addressed the claimant's ankle injury. In fact, Dr. Lee's report makes only two brief references to the claimant's knee injury. The first relates to the history provided by the claimant. The second reference notes the claimant was referred to Dr. Silver for treatment of his knee. Dr. Lee states, I would indicate the claimant does have a significant degree of symptom magnification, if not outright malingering, in reference to this particular injury in regards to his left ankle. The MIE focused on the claimant's knee, okay? Excuse me. He focused on the ankle. So that was his report, was it not? That he was symptom magnification, if not outright malingering, in reference to the left ankle. Did he say specifically, is it fair to say, he was malingering with regard to the knee? Did he ever say that? No, he did not say he was malingering with regard to his knee. But the point is, is that there was symptom magnification, malingering, whether it's to his ankle, it also could possibly be attributed to his knee as well, Your Honor. Let me ask you this. Did Dr. Levin, who you've been citing, expressly say, there does not appear to be any symptom magnification regarding the claimant's left knee pain? I'm sorry, Your Honor? Did Dr. Levin say, quote, there does not appear to be any symptom magnification regarding the claimant's left knee pain? Did Levin say that? He did. So that contradicts Lee, does it not? It does. Okay. Counsel, your time is up. Okay. Thank you. Go ahead. All right. To conclude, Your Honors, we believe that the arbitrator's decision in finding that the left knee injury and resulting cartilage damage was contrary to the manifest weight of the evidence and that the commission's decision in affirming that was also against the manifest weight of the evidence. Thank you, counsel. Counsel, you may respond. Good morning, Your Honors. May it please the Court. Thomas Gale with Dworkin and Mascarello, representing Yuri Ostegi, a Pelig employee. It is our position that the commission decision should be affirmed. It was not against the manifest weight of the evidence, and Petitioner has proven his case with regard to the knee condition, the accident, and the need for treatment. What's your response to his argument? Yeah, you know, Dr. Silver said this, Dr. Silver said that, but he's claiming no objective medical evidence to support Silver's opinion. What's your response to that? Absolutely, Your Honor. My response to that is that on physical examination, it is noted that there is patellofemoral clicking. Dr. Silver testified that the physical exam findings supported the diagnosis of damaged cartilage. That physical exam was replicated over time, over the following visits. There was a crevitation in the knee joint with a passive range of motion, and there was an ongoing complaint of the patellofemoral clicking and findings on physical exam. The chronological sequence of events having no prior knee complaints and subsequent to the accident... No record of any treatments or complaints before the accident? Correct, Your Honor. Okay. And then subsequent to the accident, when he's examined by an orthopedic doctor for his knee, the physical exam reveals findings of cartilage damage, patellofemoral clicking, lateral joint line tenderness. And Dr. Silver explained at length in his deposition testimony, in his evidence deposition, that these findings supported his conclusion that there was damage to the cartilage. And what about his other main point? Look, you have a very lengthy delay between the date of the alleged accident and the report of problems with the knee. So how do you respond to that update? Your Honor, the ankle injury presented the apparent immediate concern. He was experiencing extreme pain levels with regard to his ankle. Dr. Ramirez of Foot and Ankle Center was the first treating doctor for his ankle. And he noted, I believe it's the first visit, a 10 out of 10 level of pain. Diagnostics were performed. The pain did improve over time. It appears that it improved over time of immobilization. As the ankle improved, Dr. Ramirez found on February, the first visit in February, that he was at this time able to begin physical therapy for the ankle. Two weeks later, he returns and complains of knee pain. This coincides with the decreased immobilization and the increased activity of physical therapy for the ankle. And Dr. Silver addressed that issue, right? And Dr. Silver addressed that issue in his deposition to essentially the same conclusion. Additionally, I would like to note that the initial medical treatment is Advocate Occupational Health, Elk Grove Center. This is the Rolex Corporation Occupational Health Provider. And the accident history recorded includes twisted my left leg, left ankle and left knee complaints, slipped and fell and twisted. An x-ray was requested and completed of the left ankle and the left knee. The discharge note from that visit with the occupational health indicates a treatment plan and it's, quote, L for left knee plus L for left ankle and a referral to orthopedics. There is clear complaints contemporaneously with the accident. And that's your position? You're sticking to it, right? Yes, sir. Okay. Additionally, the commission, in review of the totality of the evidence, weighed said evidence and came to reasonable conclusions. The conclusions are supported by objective findings on physical examination. And having addressed the question of the timing of orthopedic examination of the knee, the delay, as Appellant calls it, the commission addresses each of these issues, weighs each piece of evidence, and has come to a conclusion that is not against the manifest weight of the evidence. And, Your Honor, just very briefly, in brief, Appellant notes that all of these doctors stack up against Dr. Silver. And I just wanted to point out that the advocate of occupational health cited left knee. That's the first doctor. That Dr. Ramirez of foot and ankle center was his ankle doctor and treated the left ankle and is not contrary to Dr. Silver's opinion. Dr. Silver's testimony has been discussed and is not contradicted by other evidence in the claim. Dr. Lee is an independent medical examiner under Section 12 of the Act retained by a respondent for examination of the ankle. Nowhere in his report does it contradict Dr. Silver's findings. He doesn't really deal specifically with symptom magnification of the knee, does he? He does not. And furthermore, Dr. Levin addresses, maybe not addresses, but specifically felt it noteworthy to include in his report that Mr. Uriostegui was not exhibiting symptom magnification about the knee. And then the final doctors that are mentioned in brief are Abraham and Grossman. And I did want to point out that these doctors either jointly or co-signed one report. And the one report does not review any of Dr. Silver's medical records. It only reviews Dr. Levin's records and the MRI of the knee. I think the commission, in my opinion, the commission has placed the appropriate right weight on the evidence. And I respectfully ask that this court affirm the lower court's decision. Thank you, counsel. Counsel, you have five minutes to reply. Your Honor, just very quickly, in terms of the issue with regard, just one issue, with regard to the clicking of the knee that Dr. Silver found, reportedly found upon examination. It's interesting that when we were seeing it was examined by Dr. Garcia shortly after, the day after the accident, there was no indications in the note of any clicking with regard to the knee. Secondly, with regard to Dr. Ramirez, when he complained of knee pain, there was no notion, no notes within Dr. Ramirez's examination indicating that there was any kind of clicking. So, again, Your Honor, we believe that the objective medical evidence in this case demonstrates that there was no indication, that it was against the manifest weight of the evidence, that Mr. Agostini had sustained cartilage damage as a result of the work-related injury requiring orthoscopic surgery. Thank you, Your Honor. Very good. Thank you, Counsel Bull. This matter will be taken under advisement. Written disposition shall be issued. Thank you.